**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JAMES WILLIAM KELLEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-0599 |
| | § | |
| CHESAPEAKE OPERATING, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

In this personal-injury lawsuit James William Kelley sued Chesapeake Operating, Inc. ("Chesapeake"), for injuries he suffered while working for a drilling company on a Chesapeake-owned oil well. Kelley was employed by Goober Drilling Corp. ("Goober"). Chesapeake contracted with Goober to drill the well. Kelley was hurt when he fell from the drilling rig to the ground after a guardrail gave way. Kelley's remedies against Goober were limited to those provided by the Workers' Compensation Act. In this suit, Kelley alleged that Chesapeake breached its duty to furnish him a safe workplace. He alleged that Chesapeake's representatives at the rig exercised control over the safety of the rig, knew the guardrail was in a dangerous condition, and failed to warn rig workers. Chesapeake moved for summary judgment. (Docket Entry No. 21). It argued that Goober, not Chesapeake, oversaw rig safety and operations, and that Chesapeake's representatives did not know the guardrail was damaged before Kelley was injured. (*Id.* at 8–12). Kelly responded, (Docket Entry No. 22), and Chesapeake replied, (Docket Entry No. 23).

Based on the pleadings, the summary-judgment evidence, the motion and response, and the relevant law, this court grants Chesapeake's motion for summary judgment. Final judgment for Chesapeake is entered by separate order. The reasons for this ruling are explained below.

**I.     Background**

   **A.     The Summary-Judgment Record**

The record is extensive. The exhibits to Chesapeake's motion for summary judgment include the following:

| EX. NO. | DESCRIPTION |
|---|---|
| A. | International Association of Drilling Contractors ("IADC") Drilling Contract |
| B. | Excerpts from deposition of James Kelley |
| C. | Excerpts from deposition of Daniel Gates, Chesapeake representative |
| D. | Excerpts from deposition of James Donaldson, Chesapeake representative |
| E. | Goober Accident Investigation Report |
| F. | James Donaldson Invoice |
| G. | Report of Goober Inspection of Rig 27 on July 22, 2008 |
| H. | Chesapeake Daily Drilling Report |
| I. | Excerpts from Goober Safety Setup |
| J. | Affidavit of Charlotte Fields, counsel for Chesapeake |

(Docket Entry No. 21, Exs. A–J).

The exhibits to Kelley's response are as follows:

| EX. NO. | DESCRIPTION |
| --- | --- |
| A. | Affidavit of Kenneth Kaigler, Kelley's liability expert |
| B. | Affidavit of Charles Thompson, Chesapeake Operating Field Safety Representative |
| C. | Statement of Charles Thompson |
| D. | Expert report of Kenneth Kaigler |
| E. | Excerpts from deposition of Travis Stewart, Goober floor hand |
| F. | Excerpts from deposition of James Kelley |
| G. | Excerpts from deposition of Donald Gates |
| H. | Excerpts from deposition of James Donaldson |

(Docket Entry No. 22, Exs. A–H).

Chesapeake submitted additional exhibits with its reply brief. These are excerpts from Travis Stewart's deposition, (Docket Entry No. 23, Ex. K); two color photographs of the rig that were attached to Goober's accident investigation report, (*id.*, Ex. L); and the same two color photographs highlighted to show some details of the rig's guardrail structures, (*id.*, Ex. M).

**B.     The Facts Shown in the Record**

Many of the relevant facts are undisputed. Chesapeake owned and operated the well at issue, which was in Ellis County, Texas. Chesapeake contracted with Goober to drill the well.

3

Goober operated Rig 27 at the well on July 24, 2008, when Kelley, a Goober rig worker, fell from the rig to the ground after a guardrail he leaned on gave way.

Before this incident, Goober moved Rig 27 to the site and set it up. (Docket Entry No. 21, Ex. B, at 36). Drilling began on June 29, 2008. (Docket Entry No. 21, Ex. H). Goober gave its crew safety instructions during rig setup. The safety instructions included a 334–page guide called the "Goober Safety Setup," (Docket Entry No. 21, Ex. I). The instructions were intended "to help 'setup' the rig as safely as possible and then consistently maintain that level of safety in order to eliminate or reduce hazards." (*Id.* at 1). Goober required its workers to follow the Goober Safety Setup "at all times during rig up" and emphasized that "[e]very effort should be made by Goober Drilling and its employees to keep their work place free from all recognized hazards that can cause death and serious bodily injury." (*Id.*)

Among other things, the Setup required the use of "V-door" gates, webbing, and double chains or bars on the rig, (*id.* at 20); guardrails and toeboards installed along open edges of the drill floor, (*id.* at 30–31); and guardrails and midrails installed along all open side edges of floors, platforms, etc., (*id.* at 256). A "V-door" is an upside-down V-shaped opening in one side of the derrick. The opening allows long pipes and tools to be lifted into the derrick. (Docket Entry No. 23, at 4 n.2 (citing Schlumberger Oilfield Glossary, http://www.glossary.oilfield.slb.com/en/Terms.aspx?LookIn=term%20name&filter=vee-door (last visited April 7, 2013))). The V-door gate prevents people from falling through the V-door. (Docket Entry No. 22, Ex. B, at 1).

Chesapeake hired two independent contractors, Daniel Gates and James Donaldson, to serve as "company men" at the well. (Docket Entry No. 21, Ex. C, at 6–7; Ex. D, at 6). Chesapeake

4

concedes, for purposes of its motion, that Gates and Donaldson were Chesapeake agents at the time of Kelley's incident. (Docket Entry No. 21, at 4 n.2). Gates was the "company man" on duty when Kelley fell. (Docket Entry No. 21, Ex. C, at 26). As the company man on duty, Gates was responsible for gathering and reporting well data to Chesapeake, overseeing drilling costs, monitoring operations, and reporting progress at the well site. (*Id.* at 20, 24).

The parties dispute whether and to what extent a company man would have overseen or controlled operations and workers. Chesapeake states that company men generally do not interact with floorhands like Kelley. (Docket Entry No. 21, at 4). Kelley has submitted competing evidence that the responsibilities of the company-man position on Rig 27 included monitoring operations to ensure that personnel and equipment were operating safely. Kelley's evidence includes a statement from company man Gates that part of his job was to walk the drill floor every three hours to spot and report safety hazards. (Docket Entry No. 22, Ex. G, at 36). Kelley and one of his coworkers also made statements that, as the company man on the date and time at issue, Gates was in charge of the well site and responsible for ensuring that safety barriers were in place. (Docket Entry No. 22, Ex. C, at 27–29; Ex. F, at 60–63).

Kelley began his shift on the morning of July 24, 2008 by unbolting the bell nipple, a pipe that funnels tools into the well. (Docket Entry No. 21, Ex. B, at 57–58). Goober employee Jason McLaughlin told Kelley to go upstairs to the rig floor and run the hoist to lift the bell nipple. (*Id.*) Gates did not give Kelley any specific instructions. (*Id.* at 59–60, 62). Kelley walked up to the rig floor but realized that he had no one to "spot" him. It was standard Goober safety practice to have a second worker "spot" a rig worker operating a hoist. (*Id.* at 58). Kelley went to the edge of the rig floor, grabbed the guardrail, and leaned over to call down for a spotter. (*Id.* at 58–59). The

guardrail collapsed when Kelley leaned on it. He fell over twenty feet to the ground. (*Id.* at 66–68; Ex. E).

Goober investigated the accident and issued the following report on the cause of the guardrail collapse:

> The guardrail was not completely seated into position. There was no indication from the investigation that the guardrail had been previously removed during the drilling operations. It was concluded the guardrail was never completely secured at rig-up. Note: When re-installing the guardrail during the investigation, it fit very tightly into its base and a sledge hammer was required to fully seat the guardrail into a secure position.
>
> The V-door gate being knocked from its base during [a] previous incident involving the casing fill up tool and no longer bracing the guardrail allowed the guardrail to collapse when leaned on by Mr. Kelley. The guardrail and V-door post was put into position to recreate how the guard rail appeared to be secured to its base and how the V-door gate kept it from collapsing.

(Docket Entry No. 21, Ex. E). Goober had inspected Rig 27 on July 22, 2008. No problems with the guardrails were noted. (Docket Entry No. 21, Ex. G, at 00211).

Gates testified that he did not know that there was a problem with the guardrail before the incident. (Docket Entry No. 21, Ex. C, at 89). To Gates's knowledge, no other Chesapeake employee or representative knew of a problem with the guardrail. (*Id.*) He testified that if he had known about a problem, he would have fixed it. (*Id.*)

Gates had told a Chesapeake safety investigator, Charles Thompson, that he knew the V-door gate had been sheared from its welds during cementing operations performed by a third party. (Docket Entry No. 22, Ex. B, at 1). Gates watched the cementing operation. (Docket Entry No. 22, Ex. G, at 42, 46). Gates was told that the V-door gate had fallen down. Gates later saw the V-door gate on the yard. (*Id.* at 47–48).

Thompson, who investigated after Kelley fell, gave statements in this lawsuit to the effect that the V-door gate formed part of the fall-protection system and the guardrail that failed when Kelley leaned on it was immediately adjacent to the V-door. (Docket Entry No. 22, Ex. B, at 2). Thompson also stated that Gates, as the company man on duty, would have been responsible for inspecting the guardrail after the V-door gate was knocked down, but Gates did not do that. (Docket Entry No. 22, Ex. C, at 2–3). Nor did Gates warn incoming crew the following day that the V-door gate had fallen. (Docket Entry No. 22, Ex. B, at 2).

Kelley also submitted expert testimony from Kenneth Kaigler, a petroleum engineer, who opined on whether Gates would have known about the dangerous condition and would have been able to warn rig workers about it. (Docket Entry No. 22, Ex. D). Kaigler stated that Chesapeake maintained control over the manner in which its independent contractors performed their duties. Kaigler also stated that as the company man who was onsite, Gates would have known about the hazardous condition before Kelley fell but failed to warn of the dangerous condition.

## II. The Summary-Judgment Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not

need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III. Analysis

Under Texas law, applicable because the parties are diverse, Chapter 95 of the Texas Civil Practice & Remedies Code provides the exclusive remedy against a property owner such as Chesapeake. *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 88 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (holding that when Chapter 95 applies, it is the plaintiff's "exclusive remedy" and "precludes common-law negligence liability"). Chapter 95 applies because Chesapeake is a "property owner," Kelley's claim "arises from the condition or use of an improvement to real

8

property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement." TEX. CIV. PRAC. & REM. CODE ANN. § 95.002.

The parties' dispute centers on whether Chapter 95 bars Kelley's claim. For his claim to survive, Kelley must raise a fact dispute material to determining whether Chesapeake: (a) exercised or retained control over the manner in which the work was performed; (b) had actual knowledge of the danger or condition; and (c) failed to warn of the danger or condition. *See id.*, § 95.003; *see also Fisher v. Lee & Chang P'ship*, 16 S.W.3d 198, 200–01 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). The record must support an inference by a reasonable fact finder that these conditions are satisfied to defeat Chesapeake's motion for summary judgment that it is not liable for Kelley's injuries. *See Chi Energy, Inc. v. Urias*, 156 S.W.3d 873, 879 (Tex. App.—El Paso 2005, pet. denied); *Fisher*, 16 S.W.3d at 203.

The parties dispute whether Chesapeake retained or exercised control over Kelley's work. A property owner has such control if it had a contractual right to do so or exercised actual control. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002); *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999); *Chi Energy*, 156 S.W.3d at 879. Chesapeake argues that whatever control it may have had, it did not retain or exercise control over fall-safety protections or the way Kelley was working when he fell. (Docket Entry No. 21, at 11).

Kelley cited contract provisions that purportedly gave Chesapeake a right to control his work, and also presented evidence from rig workers to the effect that Gates did in fact exercise control. (Docket Entry No. 22, at 4–6). Assuming — without deciding — that the record presents a factual dispute as to whether Chesapeake had exercised control over the way in which Kelley did his work and over safety conditions, including the condition of the guardrail, there is no genuine fact dispute as to the remaining Chapter 95 elements.

The record defeats a genuine fact dispute about whether, or a reasonable inference that, Chesapeake knew that the guardrail was in a dangerous condition. The crux of Kelley's argument is that Gates knew that the V-door gate had fallen, yet did not warn anybody and did not promptly arrange for its repair. Kelley argues that the guardrail collapsed when he leaned on it as a consequence of the adjacent V-door gate having fallen. But there is no evidence that Gates knew, or even that he should have known, that the guardrail was at risk for collapsing because the V-door gate had been knocked off its base and removed.

It is undisputed that the V-door gate was intended to keep rig workers from falling through the V-door opening. There is no serious dispute that Gates knew that the absence of the V-door gate meant that someone could fall through the V-door. There is no evidence, however, that Gates or anybody else knew that the guardrail had been improperly installed but had been supported by the V-door gate, and that once the gate was removed, the guardrail was essentially unsupported. There is no evidence that before Kelley fell, anybody knew that the V-door gate was functioning to support the guardrail rail. Knowledge that the V-door gate had previously been knocked off its base does not give rise to or support an inference of knowledge that the guardrail was unsafe before Kelley leaned on it and it gave way. *See Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 407 (Tex. 2006) ("Ordinarily, an unreasonably dangerous condition for which a premises owner may be liable is the condition at the time and place injury occurs, not some antecedent situation that produced the condition."); *Richard v. City of Austin*, 2009 WL 1364359, at *4 (Tex. App.—Austin May 13, 2009, no pet.) (finding the injury producing "condition" to be an unstable piece of steel rather than the overall demolition plan itself).

The injury-producing condition was the improperly installed guardrail. There is no evidence that would tend to show that Chesapeake had actual knowledge of that condition before the incident.

The fact that the V-door gate had fallen does not provide knowledge that the guardrail was insufficiently supported and cannot support a Chapter 95 claim. *See Phillips v. Dow Chem. Co.*, 186 S.W.3d 121, 135 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (explaining that Chapter 95 rejects constructive knowledge as a basis for liability).

In sum, there is no genuine dispute about, or inference of, Chesapeake's knowledge that the guardrail was dangerous. For similar reasons, Chesapeake could not have warned about that condition. Chesapeake is entitled to summary judgment.

**IV.   Conclusion**

For the reasons stated above, Chesapeake's motion for summary judgment, (Docket Entry No. 21), is granted. Final judgment is entered by separate order.

SIGNED on April 9, 2013, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge